# Exhibit A

Department of Health and Human Services
OFFICE OF INSPECTOR GENERAL
OFFICE OF INVESTIGATIONS

# REPORT OF INTERVIEW

Michael Pariente was interviewed via a TEAMS meeting on 6/5/2026 by Main DOJ Attorney Chris Wenger, AUSA Jess Oliva, and Special Agent (SA) Jenny L. Hahn (via telephone). After being advised of the nature of the interview and the identity of the Interviewers, Michael Pariente provided the following information, in substance:

**THIS MATERIAL IS SUBJECT TO A PROTECTIVE ORDER DATED 05/20/2026, IN CASE NO. 2:25-cr-00179-RFB-BNW**

**PURPOSE OF INTERVIEW**

The purpose of the interview was to discuss the Motion to Withdraw Guilty Plea and Set Aside Waiver of Indictment.

Prior to the interview, Wenger discussed the scope of the waiver of attorney client privilege. Pariente stated he read it and understands it. Pariente stated that he went through the Motion and attachments. He had sufficient time with them. He has not been able to listen to the recording.

Pariente explained that he represented Gonzalez alone and that no other lawyers or staff were involved.

**GONZALEZ'S ALLEGATIONS**

Paulino Gonzalez makes allegations against Pariente in his Motion to Withdraw Guilty Plea and Set Aside Waiver of Indictment. Gonzalez alleges that he had no idea there was an investigation. That is not true. Gonzalez made statements that he knew this day would come in reference to when SAs first knocked on his door. Gonzalez made millions of dollars, and he was aware of the investigation due to FBI interviewing him prior to Gonzalez retaining Pariente.

Regarding the statements that the government only had to prove the money went into Gonzalez's account, this is taken out of context because there were numerous discussions Pariente had with Gonzalez regarding knowledge and deliberate ignorance. Pariente learned a great deal about deliberate ignorance as a Federal Public Defender in El Paso, Texas. Pariente compared deliberate ignorance to someone driving a car a short distance over the border for $1000. Most people would realize there is something not correct/illegal in the car, so they would not do it. Pariente explained to Gonzalez that

| | | | | | |
|---|---|---|---|---|---|
| Interview Conducted on | 6/5/2026 | At | Las Vegas, Nevada | | |
| By | (SA) Jenny L. Hahn (via telephone) | | | Inv. Phone Number | 702-528-2512 |
| Date(s) Prepared | 6/12/2026 | By | Jenny L. Hahn | Case Number | L-23-0-0129-9 |

*This document, including any attachments and information contained therein, is the property of HHS OIG and is for OFFICIAL USE ONLY. The original and any copies of the report must be appropriately controlled and maintained. Disclosure to unauthorized persons without prior written approval of the Deputy Inspector General for Investigations or his/her designee is strictly prohibited and may subject the disclosing party to liability. Unauthorized persons may include, but are not limited to, individuals referenced in the report, contractors, and individuals outside the HHS. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).*

people were not going to be legally paid millions of dollars for wound care nursing, as Gonzalez was paid. Gonzalez knew that receiving $7 million was too good to be true and told the government that during his first proffer. Pariente explained intent and conspiracy law to Gonzalez.

Gonzalez made allegations that he never saw any proof of his guilt. This is not true. Gonzalez knew things were too good to be true. Pariente explained to Gonzalez that millions of dollars in kickbacks went to Gonzalez. Pariente explained to Gonzalez that Medicare rules do not allow outstanding funds to go to providers, such as the kickbacks. Pariente explained to Gonzalez that emails to Gonzalez from Stephen Dubin were incriminating. Pariente explained to Gonzalez that Dubin was overbilling and the overage of funds should be returned to the government, not shared among the providers. Pariente and Gonzalez discussed how the government could prove its case. Gonzalez's statement that he never saw any evidence of his guilt is "a total lie."

Pariente represented Gonzalez at numerous proffers where Gonzalez admitted wrongdoing.

**JANUARY 27, 2025, PROFFER**
In January of 2025, Gonzalez retained Pariente. Pariente recalls the January 27, 2025, proffer with the government. In that proffer, Pariente recalls Gonzalez made admissions including the following:

- Gonzalez worked for both the supplier of the grafts, Rick Logwood, and for Dubin.
- Gonzalez was paid by both Dubin and the supplier.
- Gonzalez received millions of dollars from Logwood.
- There were no signed contracts between Gonzalez and Logwood.
- Logwood introduced Gonzalez to Dubin.
- Gonzalez applied grafts alone without another provider present. Gonzalez did so alone, as a Licensed Practical Nurse (LPN). Dubin told Gonzalez that if anyone asked him about this, Gonzalez should say that Dubin applied the grafts.
- Gonzalez questioned Dubin's treatment plans at times and thought more conservative treatment was appropriate. Gonzalez questioned Dubin about this and Dubin would instruct him to continue with applying wound grafts. Gonzalez did as instructed.
- Gonzalez knew Dubin's business was applying grafts to patients near end of life and/or on hospice. Gonzalez felt they were inappropriate treatments due to end of life/hospice designations. Gonzalez stated one patient he felt uncomfortable using wound grafts on included an elderly woman who had a Hispanic last name that may have started with M and one female patient who was in her 90s (possibly 92 years old).

**REVERSE PROFFER**
Gonzalez was untruthful about the reverse proffer and his lack of knowledge regarding government proof in his Motion. In his Motion, Gonzalez said he did not believe the government could prove their case. In reality, Gonzalez was crying in the reverse proffer and making statements that indicated he had remorse and that the case was easily provable. US DOJ Trial Attorney Monica Cooper also explained conspiracy to Gonzalez at the reverse proffer, which made Gonzalez cry and take responsibility for his involvement.

Cooper and Agents who met with Gonzalez at the reverse proffer would also make good witnesses. At the end of the slide presentation during the reverse proffer, Pariente recalls Cooper provided slides that stated conspiracy must be knowingly and willfully committed. Cooper was very detailed and thorough.

Pariente recalls Cooper accurately presenting the elements, as well as the facts she would use to prove each element. Cooper went through emails line by line, went through slides word by word.

At the reverse proffer, Cooper showed Pariente and Gonzalez photos of wound grafts where the grafts were far too large for the wound. Gonzalez stated that he did not know why he would use such a large graft in that scenario. Gonzalez explained that he would use extra wound graft material by curling it up and placing it in wounds.

Pariente recalls Cooper being incredibly thorough and knowledgeable. Cooper knew the case far better than other AUSAs Pariente has ever dealt with. Gonzalez was accurately and correctly shown the elements of the crimes in the reverse proffer. Cooper clearly made Gonzalez realize that he was guilty and clearly explained the criminal elements. Gonzalez cried due to his guilt. Pariente described the reverse proffer as "devastating" and said the government has Gonzales "dead to rights." Pariente described Gonzalez as ashamed, remorseful, and disappointed in himself.

This reverse proffer lasted more than an hour.

**GOVERNMENT EVIDENCE SHARED WITH GONZALEZ**

Examples of some evidence the government shared with Gonzalez and Pariente include the following:

- A document indicating billed and paid amounts for wound grafts in the case. This evidence was included in one of many emails from Cooper.
- A DOJ production of materials. On March 18, 2025, at 2:39pm, Cooper's DOJ office sent a Box link sent to Pariente. Pariente cannot recall offhand all of the materials provided via that link, but he believes he shared the information in the link with Gonzalez.
- A document Pariente saw that indicated Dubin was paid approximately $56 million by Medicare. This was a chart provided by DOJ and Pariente shared that chart with Gonzalez. Pariente recalls going over that chart with Gonzalez.
- Cooper showed Pariente photos of wounds (via Zoom or other virtual meeting type). Pariente explained these photos to Gonzalez and went over them with Gonzalez. This was prior to the reverse proffer. Pariente wanted DOJ to show these photos to Gonzalez so he would see the lack of medical necessity evidence in black and white.

Pariente understands that full discovery does not need to take place pre-Indictment. Cooper was very fair to deal with as a prosecutor. In his cases, Pariente always asks prosecutors to voluntarily share evidence, and he did the same here. Cooper sent some materials, but not a ton. Pariente felt he had enough information to advise Gonzalez. Pariente went over those materials with Gonzalez, discussed things such as Dubin's payments (around $54 million) from Medicare and other evidence. During this discussion, Gonzalez made statements that Dubin recently bought a yacht.

**OTHER PARIENTE INFORMATION**

Pariente explained basic conspiracy law to Gonzalez and Pariente believes Gonzalez understood. Pariente said he did not use the Taxi driver / bank robbery analogy as Gonzalez described it in his Motion. Instead, Pariente explained that an Uber or Taxi driver would not be held criminally culpable for a robbery if the driver did not know about the robbery and did not benefit from the robbery. Pariente also explained that an Uber or Taxi driver could be criminally liable if they drove a robber to a bank knowing that the robber was going to rob the bank. Pariente explained to Gonzalez that conspiracies do not have to include a formal agreement and can be proven through course of conduct.

Pariente explained conspiracy to Gonzalez on numerous occasions and explained things such as non-verbal actions.

Gonzalez was "blinded by the money". Gonzalez is "lying" in the Motion. Gonzalez was devastated when he was "fired" from his job. Gonzalez was terminated because his employer saw the government press release regarding Gonzalez's charges and guilty plea.

Gonzalez has a selective memory regarding his role in the conspiracy

Gonzalez is likely going to receive more time at Sentencing by rescinding his Plea Agreement.

Pariente has experience explaining conspiracies to other defendants on numerous past occasions. Pariente was hopeful that Gonzalez could not be charged because he was the first to cooperate. Pariente tried to get DOJ to allow Gonzalez to cooperate without being charged, but DOJ declined.

**GONZALEZ SUBPOENA AND PRODUCTION**

Gonzalez was issued a subpoena regarding the case. Gonzalez was very thorough in turning over what he had. Pariente is aware of that subpoena and believes he was involved in service of that subpoena. Pariente went over the subpoena with Gonzalez. Regarding what was produced, Pariente recalls Gonzalez was forthcoming with materials and produced a great deal of materials in response. Some materials Pariente recalls include information regarding someone named Brian Fitzpatrick, bank records, emails, etc. Pariente felt because Gonzalez received $7 million, some of which included checks that said Dubin commissions in the memo line, this was very damaging to Gonzalez. Pariente discussed this with Gonzalez.

**PLEA AGREEMENT AND POTENTIAL PROFESSIONAL LICENSEURE ISSUES**

Pariente advised Gonzalez to plead guilty and cooperate. Pariente tried to get the government to allow Gonzalez to cooperate without being charged or being charged with a misdemeanor, but the government declined. In Pariente's experience, in multi-defendant cases, it is often beneficial to be the first to cooperate, as that often leads to better outcomes.

Gonzalez read and understood the Plea Agreement with Pariente. Pariente did not expect the press coverage but informed Gonzalez before he entered into the Plea Agreement that it would be searchable and findable in Pacer.

Pariente explained to Gonzalez that collateral consequences include things such as professional licenses. Pariente acknowledged that collateral consequences, such as losing a professional license, is discussed in the Plea Agreement. Gonzalez knew he was going to lose his license. Pariente worked with Cooper to charge Gonzalez in the best manner for Gonzalez and his potential licensure issues. Pariente noted that Gonzalez pleaded guilty to a kickback conspiracy, rather than conspiracy to commit health care fraud. Pariente thought that charge would be better in terms of Gonzalez being able to get his license reinstated later. Pariente put Gonzalez in touch with Lyn Baggs, an attorney who handles professional licensure issues before Nevada Medical Board. Pariente was hopeful Baggs could work through potential licensure issues for Gonzalez.

**PARIENTE PRODUCTION AND FUTURE COOPERATION**

Pariente is uploading numerous text messages and screenshots regarding his communications with Gonzalez for Pariente's production to the government. Pariente reviewed them prior and deemed them appropriate to share under the waiver. Pariente does not typically take notes. Pariente finds he recalls things better by listening carefully and not focusing on notes.

Pariente will listen to the June 20, 2025, recording Gonzalez surreptitiously recorded with Pariente.

Pariente will be out of the country on a trip of a lifetime in late August through most of September, 2026. He should be able to reach telephonically.

06/05/2026 Michael Pariente Notes by SA Hahn

Main DOJ Attorney Chris Wenger, AUSA Jess Oliva, (via TEAMS) SA Hahn (telephonic)

Motion to Withdraw Guilty Plea and Set Aside Waiver of Indictment

Scope of the waiver of attorney client privilege discussed by Wenger... Pariente has read it and understands it.

Pariente went through the Motion and attachments. He had sufficient time with them. He has not been able to listen to the recording.

Accusation – He had no idea there was an investigation. That is not true. He made statements that he knew this day would come. He made millions of dollars and he was aware of the investigation due to FBI interviewing him.

Pariente uploading numerous text message and screenshots. He reviewed them prior and deemed them OK to share under the waiver.

Proved the money went into the account. This is taken out of context because there were numerous discussions regarding his deliberate ignorance. Pariente learned a great deal about deliberate ignorance as a FPD in El Paso. Pariente compared it to someone driving a car over the boarder for $1000. Most people would realize there is something not correct/illegal in the car, so they would not do it. Pariente explained that people were not going to be paid millions of dollars for wound care nursing as he was paid.

Gonzalez never saw any proof of his guilt. This is not true. Gonzalez knew things were too good to be true. Pariente explained that millions of dollars in kickbacks went to Gonzalez.

Pariente explained - Medicare rules do not allow outstanding funds to go to providers, such as the kickbacks... Pariente explained this to Gonzalez.

Pariente explained - Emails to Gonzalez from Dubin... Dubin was overbilling and the overage of funds should be returned to the government, not shared among the providers.

Gonzalez lied about the revers proffer and his lack of knowledge regarding government proof. Gonzalez said he did not believe the government could prove their case. Gonzalez was crying in the reverse proffer and making statements that indicated he had remorse and

that the case was easily provable. Pariente explained conspiracy theories to Gonzalez and Gonzalez understood that he knew there was a conspiracy and he benefited by millions of dollars. Pariente explained that an Uber or Taxi driver would not be held criminally culpable for a robbery if the driver did not know about the robbery and did not benefit from the robbery. Pariente explained that conspiracies can be communicated in a variety of ways, not necessarily just via discussions. Pariente explained conspiracy to Gonzalez on numerous occasions and explained non-verbal actions. Cooper also explained conspiracy to Gonzalez, which made Gonzalez cry and take responsibility for his involvement.

Cooper and Agents who met with Gonzalez would also make good witnesses. At the end of the slide presentation in one meeting, Pariente recalls Cooper provided slides that stated conspiracy must be knowingly committed. Cooper was very detailed and thorough. Cooper went through emails line by line, went through slides word by word.

Cooper showed Pariente photos of wound grafts where the grafts were far too large for the wound. Gonzalez stated that he did not know why he would use such a large graft in that scenario. Gonzalez explained that he would use extra wound graft material by curling it up and placing it in wounds.

Pariente recalls Cooper being incredibly thorough and knowledgeable. Cooper knew the case far better than other AUSAs Pariente has ever dealt with. Gonzalez was accurately and correctly shown the elements of the crimes in the reverse proffer. Cooper clearly made Gonzalez realize that he was guilty and clearly explained the criminal elements. Gonzalez cried due to his guilt. This reverse proffer lasted more than an hour.

January – Pariente retained.

**GOVERNMENT EVIDENCE SHARED WITH GONZALEZ**

Billed and paid amounts for wound grafts. (email from Cooper)

March 18, 2025 2:39pm – Box link sent to Pariente by DOJ – Pariente shared the information in the link with Gonzalez. Gonzalez had a selective memory regarding his role in the conspiracy

Dubin was paid $56 million – Pariente saw this in a chart and shared that chart with Gonzalez. Pariente recalls going over that chart with Gonzalez.

June 15 recording... Gonzalez met with FBI Special Agents. Gonzalez advised Pariente that he knew this day would come.

Gonzalez was issued a subpoena. Gonzalez was very thorough in turning over what he had. Pariente is aware of that subpoena and believes he was involved in service of that subpoena. Pariente went over the subpoena with Gonzalez. Regarding what was produced, Pariente recalls Gonzalez was forthcoming with materials and produced a great deal of materials in response. Some materials Pariente recalls include information regarding someone named Brian Fitzpatrick, bank records, emails, etc. Pariente felt since Gonzalez received $7 million, some of which was from Dubin with commissions in the memo line. This was very damaging to Gonzalez.

Prior to Indictment, Pariente understands that full discovery does not need to take place pre-Indictment. Cooper was very fair and wonderful to deal with as a prosecutor. Pariente always asks for some materials that can help resolve the case. Cooper sent materials. Pariente felt he had enough information to resolve the case. Pariente went over those materials with Gonzalez, discussed things such as Dubin's payments (around $54 million) from Medicare. Gonzalez made statements that Dubin recently bought a yacht. Gonzalez

Pariente has experience explaining conspiracies to other defendants on numerous occasions. Pariente was hopeful that Gonzalez could not be charged because he was the first to cooperate.

Gonzalez makes allegations that he made no statements of guilt. Numerous proffers where Gonzalez admitted wrongdoing.

January 27, 2025 proffer with the government– Gonzalez admitted he worked for both the supplier of the grafts (Logwood) and for Dubin. He was paid by both Dubin and the supplier. There was no signed contracts between G and Logwood. Dubin introduced him to Logwood. Gonzalez admitted he applied grafts alone without another provider present. Gonzalez stated he did so alone, as a LPN. Dubin told him that if anyone asked him about this, Gonzalez should say that Dubin applied the grafts. Gonzalez questioned treatment at

times and thought more conservative treatment was appropriate. Gonzalez questioned Dubin about this and Dubin would instruct him to continue with applying wound grafts. Gonzalez did so. Gonzalez knew they were applying grafts to patients near end of life and/or on hospice. Gonzalez felt they were inappropriate treatments due to end of life/hospice designations. Gonzalez stated one patient he felt uncomfortable using wound grafts on included an elderly woman who had a Hispanic last name that may have started with M and one female patient who was in her 90s (possibly 92).

Cooper showed Pariente photos of wounds (via Zoom or other virtual meeting type). Pariente explained these photos to Gonzalez and went over them with Gonzalez. This was prior to the reverse proffer.

Pariente was trying to make Gonzalez comfortable and understand that when grafts are too large for wounds, this is not medically necessary.

Gonzalez was "blinded by the money". Gonzalez is "lying". Gonzalez was devastated when he was "fired" from his job. Gonzalez was terminated because his employer saw the government press release. Gonzalez is going to receive more time by rescinding his Plea Agreement.

Gonzalez read and understood the Plea Agreement. Gonzalez understood that he was entering into a Plea Agreement that was searchable and findable in Pacer. Collateral consequences include things such as professional licenses. Pariente worked with Cooper to charge Gonzalez in the best manner for Gonzalez and put Gonzalez in touch with Lyn Baggs, attorney who handles professional licensure issues before Nevada Medical Board. Try to work through licensure issues.

Pariente uploaded primarily text messages between him and Gonzalez for the production to the government. Pariente does not typically take notes. He finds he recalls things better by listening carefully and not focusing on notes.

Pariente will listen to the June 20, 2025 recording Gonzalez surreptitiously recorded with Pariente.

Pariente is willing to cooperate with the government regarding the matter in the future. Pariente is out of the country on a trip of a lifetime in late August through most of September, 2026. Cruise through Anchorage, Aleutian Islands, Greenland, etc. Communications during that month will work through wi-fi on the cruise.